UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK HATTORI and SUSAN NEWMAN, derivatively on behalf of COUPANG, INC., <br><br>    Plaintiffs, <br><br>  v. <br><br> GAURAV ANAND, MATTHEW CHRISTENSEN, LYDIA JETT, BEOMSEOK KIM, NEIL MEHTA, MICHAEL PARKER, BENJAMIN SUN, KEVIN WARSH, and HARRY YOU, <br><br>    Defendants, <br><br>  and <br><br> COUPANG, INC., <br><br>    Nominal Defendant. | Case No:_____ <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiffs Mark Hattori and Susan Newman ("Plaintiffs"), by and through their counsel, derivatively on behalf of Nominal Defendant Coupang, Inc. ("Coupang" or the "Company"), submit this Verified Stockholder Derivative Complaint against Defendants (as defined herein) and allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by Coupang with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Coupang; (iii) securities class action against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading between March 11, 2021 and March 15, 2022, inclusive (the "Relevant Period"), with respect to Coupang's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Coupang.

## NATURE OF THE ACTION

1.       This is a stockholder derivative action asserted on behalf of Nominal Defendant Coupang against certain officers and the members of the Company's Board for their breaches of fiduciary duties to recover damages caused to the Company as described herein.

2.       Throughout the Relevant Period, the Individual Defendants (as defined below) made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that (a) Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including (i) pressuring

1

suppliers to raise prices of products on competing e-commerce platforms to ensure Coupang's prices would be more competitive, (ii) coercing suppliers into purchasing advertisements that would benefit Coupang financially, (iii) forcing suppliers to shoulder all expenses from sales promotions, and (iv) requesting wholesale rebates from suppliers without specifying any terms relating to rebate programs, all of which served to artificially maintain Coupang's lower prices and artificially inflate Coupang's historical revenues and market share; (b) Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform to prioritize its own private-branded ("PB") products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers; (c) unbeknownst to its customers who were members of Rocket WOW, a subscription-based program that offers members free shipping, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members; (d) Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions; (e) all of the above illicit practices exposed Coupang to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm Coupang's critical relationships with consumers, merchants, suppliers, and the workforce; and (f) Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

3.      As a direct and proximate result of the misconduct described herein by the Individual Defendants, Coupang has sustained significant damages as explained below.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 10(b) and 20(a) of the Exchange Act and SEC

Rule 10b-5 promulgated thereunder as well as Section 11(f) of the Securities Act of 1933. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

5.      This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this District; a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Coupang occurred in this District; and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

7.      Plaintiff Mark Hattori is a stockholder of Coupang. He was a stockholder at the time of the wrongdoing alleged herein and has continuously held stock in the Company from that time until the present.

8.      Plaintiff Susan Newman is a stockholder of Coupang. She was a stockholder at the time of the wrongdoing alleged herein and has continuously held stock in the Company from that time until the present.

9.      Nominal Defendant Coupang is an e-commerce business incorporated in Delaware and headquartered in Seoul, South Korea. It has offices in South Korea, China, Singapore, Japan, Taiwan, and the United States. Coupang's Class A common stock trades on the New York Stock Exchange under the ticker symbol CPNG.

10.     Defendant Gaurav Anand ("Anand") has served as Coupang's Chief Financial Officer ("CFO") since December 2020. Prior to his role as CFO, Anand served as Coupang's Chief Operating Officer from January 2019 to December 2020, the Chief of Staff to Coupang's Chief Executive Officer ("CEO") from January 2017 to December 2018, and CFO of Global eCommerce for Coupang from January 2017 to December 2017.

11.     Defendant Matthew Christensen ("Christensen") was a member of Coupang's Board from at least March 2021 until he resigned on June 7, 2021.

12.     Defendant Lydia Jett ("Jett") was a member of Coupang's Board from 2016 until she resigned on October 26, 2021. In 2021, she served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee ("Governance Committee").

13.     Defendant Beomseok Kim, known more commonly in the United States as Bom Suk Kim ("Kim"), is the founder of Coupang and has served as Coupang's CEO and as Chairman of Coupang's Board since May 2010.

14.     Defendant Neil Mehta ("Mehta") has served as a member of the Company's Board since December 2010. He has served as a member of the Audit Committee, Chair of the Compensation Committee, and a member of the Governance Committee since at least 2021.

15. Defendant Michael Parker ("Parker") served as Coupang's Chief Accounting Officer from October 2019 to September 2022. Since September 2022, Parker has served as Coupang's Vice President for Investor Relations.

16. Defendant Benjamin Sun ("Sun") has served on the Company's Board since July 2010. He has served as a member of the Audit Committee since at least 2021 and as a member of the Governance Committee since 2023.

17. Defendant Kevin Warsh ("Warsh") has served on the Company's Board since October 2019. He has served as a member of the Compensation Committee and as Chair of the Governance Committee since at least 2021.

18. Defendant Harry You ("You") served as a member of the Company's Board from January 2021 until his retirement on April 17, 2023. During that time, he served as Chair of the Audit Committee and as a member of the Governance Committee.

19. Relevant Non-Party Jason Child ("Child") has served as a member of the Board since April 2022 and currently serves as Chair of the Audit Committee.

20. Relevant Non-Party Pedro Franceschi ("Franceschi") has served as a member of the Board and as member of the Compensation Committee since March 2022.

21. Relevant Non-Party Ambereen Toubassy ("Toubassy") has served as a member of the Board since March 2023. She currently serves as a member of the Audit Committee.

22. The following Defendants are collectively referenced herein as the "Individual Defendants": Anand, Christensen, Jett, Kim, Mehta, Parker, Sun, Warsh, and You.

23. The following Individual Defendants are collectively referenced herein as the "Director Defendants": Christensen, Jett, Kim, Mehta, Sun, Warsh, and You.

24.     The following Individual Defendants are collectively referenced herein as the "Officer Defendants": Anand, Kim, and Parker.

25.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Mehta, Sun, and You.

26.     The following Individual Defendants are collectively referenced herein as the "Governance Committee Defendants": Jett, Mehta, Sun, Warsh, and You.

27.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Anand, Christensen Jett, Kim, Mehta, Parker, Sun, Warsh, and You.

28.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

29.     The following chart identifies the Individual Defendants, their associated references herein, and other relevant information discussed in more detail below:

| Individual Defendants | Director Defendants | Officer Defendants | Audit Committee Defendants | Governance Committee Defendants | Securities Class Action Defendants |
|---|---|---|---|---|---|
| Anand | | CFO Dec. 2020-present | | | X |
| Christensen | Mar. 2021-June 7, 2021 | | | | X |
| Jett | 2016-Oct. 2021 | | | 2021 | X |
| Kim (Founder) | Chair May 2010-present | CEO May 2010-present | | | X |
| Mehta | Dec. 2010-present | | 2021-present | 2021-present | X |

| Parker | | Chief Accounting Officer Oct. 2019-Sept. 2022; VP for Investor Relations Sept. 2022-present | | | X |
|---|---|---|---|---|---|
| Sun | July 2010-present | | 2021-present | 2023-present | X |
| Warsh | Oct, 2019-present | | | Chair 2021-present | X |
| You | Jan. 2021-Apr. 17, 2023 | | Chair Jan. 2021-Apr. 17, 2023 | Jan. 2021-Apr. 17, 2023 | X |

## **BACKGROUND**

30.     Coupang is considered the "Amazon of North Korea." The Company operates an online marketplace that offers a wide range of products, including home goods, electronics, fresh groceries, and its own PB or private-brand items.

31.     Incorporated as Forward Ventures LLC and doing business as Coupang, the Company started as a coupon-based e-commerce platform where users could purchase tickets for theaters or travel at discounted prices. Before long, the Company expanded its platform to include an online marketplace comprised of its own line of brands as well as third-party goods.

32.     In 2013, Coupang started selling an owned-inventory selection of items. The Company also acquired the data-analytics company CalmSea, and Coupang began using machine learning to cut down delivery times. This acquisition helped Coupang analyze purchasing patterns to inform its inventory decisions and position stock in its warehouses based on demand rather than product category.

33.     In March 2014, Coupang began hiring a small fleet of its own full-time delivery drivers and launched its "Rocket Delivery" service, which guaranteed next-day delivery free of charge on qualifying items.

34.     In September 2015, Coupang extended its services to include a "marketplace" for third parties to sell their goods directly to customers. The Company expanded its platform to provide resources and/or infrastructure to small and medium-sized merchants so that they could sell their products in bulk.

35.     In 2016, Coupang changed its name from Forward Ventures, LLC to Coupang, LLC.

36.     In May 2016, the Company changed its marketplace business model and replaced it with a new platform for third-party merchants known as the "Item Market." The Item Market system used a single image to represent the same product offered by different merchants and selected an "Item Winner" from the group of merchants based on several criteria, including price.

37.     Coupang advertised the Item Market system as a tool that was good for both buyers and sellers because it purported to reduce search-result clutter and decrease entry costs for small businesses by reducing marketing and advertising costs and promoting low prices.

38.     In 2017, the Company began selling its own private line of products, and in 2018, it introduced Dawn Delivery, which guaranteed delivery by 7 a.m. on orders placed by midnight on the previous day.

39.     In 2019, Coupang launched Rocket WOW, a subscription-based program that offers its members free shipping. Rocket WOW soon expanded to include Rocket Fresh, a fresh food grocery delivery service. In the same year, the Company also launched Coupang Eats, a delivery service for food prepared by independent restaurants.

40.     The Company secured its place as the largest player in the South Korean e-commerce market. Like other e-commerce markets, Coupang's revenue skyrocketed in 2020 as the COVID-19 pandemic restrictions caused consumers to move more towards online shopping and home delivery. Between 2018 and 2020, Coupang's total revenue tripled from $4 billion to almost $12 billion.

41.     By the end of 2020, the Company employed about 50,000 workers in South Korea and operated over 100 fulfillment and logistics centers in over 30 cities across the country. Coupang boasted that this network was so extensive that 70% of South Korea's 51 million residents lived within 7 miles of a Coupang logistics facility.

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

42.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Coupang.

43.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

44.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

45.     Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good

faith and diligence in the administration of the affairs of the Company and the use and preservation of its property and assets.

46.    Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

47.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Coupang were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate

system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

48.     The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

49.     Because of their positions of control and authority, the Individual Defendants exercised control over the wrongful acts complained of herein and the contents of the various public statements issued by Coupang.

50.     The Board has adopted the Company's Code of Business Conduct & Ethics ("Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Director Defendants and Officer Defendants.

51.     Under the title "Compliance with Laws & Regulations," the Code of Conduct states that the Company is committed to the following:

- Conducting business in an ethical, transparent, and professional manner, and in compliance with laws, regulations, and our policies.

- Incorporating legal and regulatory requirements into business strategy and processes.

- Developing strong processes to anticipate risks, including new and changing legal and regulatory requirements.

- Providing employees and managers with access to the subject matter expertise needed to manage legal and regulatory risks.

- Monitoring regulatory compliance on an ongoing basis and periodically reviewing key processes.

- Remaining compliant with applicable licensing, permitting and other applicable rules and regulations in the locations where we operate.

52.    The Code of Conduct further provides as follows under the heading "Financial Integrity & Accounting":

COUPANG IS COMMITTED TO:

- Our accounting and reporting completely and accurately reflects the economic substance of Coupang's business activities, consistent with generally accepted accounting principles, standards, and regulations for accounting and financial reporting.

- Preparing complete, accurate, and timely financial information for use in reports to management, investors, regulators, and other stakeholders.

- Ensuring that management decisions are based on sound economic analysis based on comprehensive facts and with appropriate consideration of the short-and long-term benefits and risks.

- Complying with all applicable laws and regulations as well as our policies and internal controls requirements, including regarding the retention of documents and records.

EMPLOYEES MUST:

- Maintain complete, accurate, and timely records and accounts to appropriately reflect all business transactions.

- Create documents that are complete, accurate, and transparent, and follow our policies in determining when to retain and dispose of documents and records.

- Never engage in or support inappropriate transactions, including those that misrepresent the substance of a transaction.

- Maintain effective processes and internal controls that completely and accurately reflect transactions, as well as prevent or detect inappropriate transactions.

- Speak up if you become aware of a questionable transaction or accounting by notifying the Accounting leadership team or using any of the Speak Up channels.

## DIRECTOR DEFENDANTS ON PARTICULAR
## COMMITTEES OWE ADDITIONAL DUTIES

53.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Mehta, Sun, and You during the Relevant Period.

54.     Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, and Auditors;

- review any reports or disclosures required by applicable law and stock exchange listing requirements;

- help the Board oversee the Company's legal and regulatory compliance, including the internal audit function, legal function, compliance program, and risk assessment; and

- provide regular reports and information to the Board.

55.     Among the responsibilities of the Audit Committee for financial review and

disclosures are, in relevant part, the following:

**6.     Audited Financial Statement Review; Quarterly and Annual Reports.** The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors prior to filing. The Committee will be responsible for recommending to the Board whether the proposed financial statements should be included in the Company's Form 10-K.

**7.     Proxy Report.** The Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

**8.     Earnings Press Releases.** The Committee will review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

56.     The Audit Committee also has the duty to assess risks and oversee internal controls

over financial reporting:

**11.     Risk Assessment and Management.** The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. In exercising oversight of the Company's risk identification and management processes, the Committee may consider issues such as the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

**12.     Internal Control over Financial Reporting; Disclosure Controls.** The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

57.     The Nominating and Corporate Governance Committee Charter (the "Governance Charter") imposes additional duties and responsibilities on the members of the Governance Committee, which included Jett, Mehta, Sun, Warsh, and You during the Relevant Period. Among the duties imposed by the Governance Charter are the following:

- help the Board oversee the Company's corporate governance functions and develop, update as necessary and recommend to the Board the governance principles applicable to the Company;

- identify, evaluate and recommend and communicate with candidates qualified to become Board members or nominees for directors of the Board consistent with criteria approved by the Board; and

- make other recommendations to the Board relating to the directors of the Company.

## DEFENDANTS BREACHED THEIR DUTIES
## TO THE COMPANY AND ITS STOCKHOLDERS

58.     Through a series of communications, Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (a) Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including (i) pressuring suppliers to raise prices of products on competing e-commerce platforms to ensure Coupang's prices would be more competitive, (ii) coercing suppliers into purchasing advertisements that would benefit Coupang financially, (iii) forcing suppliers to shoulder all expenses from sales promotions, and (iv) requesting wholesale rebates from suppliers without specifying any terms relating to rebate programs, all of which served to artificially maintain Coupang's lower prices and artificially inflate Coupang's historical revenues and market share; (b) Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform to prioritize its PB products over those of other sellers and merchants, to the detriment of consumers, merchants, and

suppliers; (c) unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members; (d) Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions; (e) all of the above illicit practices exposed Coupang to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm Coupang's critical relationships with consumers, merchants, suppliers, and the workforce; and (f) Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

59. On February 12, 2021, Coupang filed with the SEC an initial draft of a registration statement, which the SEC declared effective on March 10, 2021, after two amendments (the "Registration Statement"). On March 11, 2021, Coupang filed with the SEC a final prospectus on Form 424B4, (the "Prospectus," together with the Registration Statement, the "Offering Materials"). The Offering Materials were signed by Defendants Kim, Anand, Parker, Christensen, Jett, Mehta, Sun, and Warsh.

60. After the SEC declared the Offering Materials effective on March 10, 2021, Coupang filed another registration statement on Form S-1MEF to automatically add 10,000,000 shares of Class A common stock to the securities registered in the Offering Materials pursuant to Rule 462(b) of the Securities Act (the "MEF Registration Statement"), thus increasing the aggregate amount of Class A common stock offered in the initial public offering ("IPO") to 130,000,000 shares, of which 30,000,000 shares were held by certain defendants, including Defendants Anand, Christensen, Mehta, Sun, Warsh, and You. The MEF Registration Statement

expressly incorporated the Offering Materials by reference. Defendants Kim, Anand, Parker, Christensen, Jett, Mehta, Sun, and Warsh signed the MEF Registration Statement

61.     On March 11, 2021, the Company conducted its IPO pursuant to these Offering Materials, during which Coupang sold (i) 100 million shares of Class A common stock at $35 per share for total gross proceeds of $3.5 billion and (ii) 20,000,000 shares of Class A common stock of Coupang held by certain existing stockholders, including 1,200,000 shares of Class A common stock owned by Defendant Kim.

62.     As of the closing of the IPO on March 15, 2021, there were a total of around 1.56 billion shares of Class A common stock outstanding and around 174.8 million shares of Class B common stock outstanding.

63.     Defendant Kim owned over 76% of the combined voting power over the Company as the sole owner of all Class B common shares. Coupang warned investors that Defendant Kim's ownership "will limit or preclude your ability to influence corporate matters for the foreseeable future."

64.     Following the closing of the IPO, only 130,000,000 shares of Class A common stock sold in the IPO were freely tradeable. The remaining Class A and Class B common stock not sold during the IPO were considered "restricted securities" and subject to one or more lock-up agreements prohibiting sales of the stock until August 13, 2021 ("Lock Up Period") unless certain conditions for an early release were met.

65.     On March 18, 2021, Coupang filed an S-8 Registration Statement containing a reoffer prospectus relating to 29,700,836 shares of Class A common stock held by over 2,000 individuals that were subject to the first early release from the Lock-Up Period on behalf of over 2,000 individuals. That early release became effective immediately upon filing. The registration

of these shares permitted their resale on the secondary market without violating Rule 144 of the

Securities Act. Defendants Kim, Anand, Parker, Christensen, Jett, Mehta, Sun, and Warsh signed

the S-8 Registration Statement.

66.     Coupang was required to publicly announce whether any of the early releases from

the Lock-Up Period were satisfied as promptly as practicable before the release became effective.

It made no such announcements other than the above-referenced one on March 18, 2021.

67.     The Offering Materials stated that Coupang had positive employee relations:

> Founded in 2010, we are a home-grown technology company that has now become
> one of the three largest private sector employers in the nation. We are a significant
> driver of new economic opportunities for the people of Korea. As of December 31,
> 2020, we directly employed over 50,000 employees globally. We consider our
> employee relations to be positive.

68.     The Offering Materials included a letter from Defendant Kim to investors stating

the following:

> We believe it is both our opportunity and responsibility to challenge expectations
> about important social issues in our community. In a market where the industry
> standard is a six-day workweek, we were the first to establish a five-day workweek
> for our drivers, even as we became the first major service to provide deliveries to
> customers seven days a week. We also hire our drivers, Coupang Friends, directly,
> and provide them with paid time off and full benefits. . . . We hope such examples
> demonstrate that innovation can unlock both a better world for our customers and
> a better workplace for our employees.

69.     The letter to investors also stated as follows:

> We also support hundreds of thousands of suppliers and merchants who earn their
> living on Coupang . . . . Even during an unprecedented pandemic, as small
> businesses in the country suffered net losses, small businesses on Coupang saw
> their sales increase by over 50% through direct access to our services and customers
> nationwide.

70.     The Offering Materials also represented that Coupang offered its business partners

advertising opportunities. Specifically, the Offering Materials stated that "[i]n addition to our e-

commerce services, we also have a new offering in the online advertising space" and that "[w]e

offer opportunities to advertise on our websites and mobile applications, including through banner

advertisements, joint promotions, and other programs."

71.     The Offering Materials further stated that "[t]he Company receives consideration

from suppliers for various programs, including rebates, incentives, and discounts, as well as

advertising services provided on its website and mobile applications."

72.     The Offering Materials also represented that Coupang provided customers with the

"lowest prices" available in South Korea:

> In addition to superior experience, we believe we also offer customers the lowest
> prices for our owned inventory selection.
>
> \*        \*        \*
>
> Our strategy is to provide the lowest prices available in the Korean market across a
> wide and diverse assortment of items.

73.     The Offering Materials further explained that Coupang was able to secure favorable

pricing for customers because of its relationships with suppliers:

> We have established an extensive network of suppliers and merchants, which
> enables us to obtain a wide selection of merchandise while maintaining low prices
> for customers. We offer millions of SKUs under our owned-inventory selection,
> which requires significant procurement expertise from local and international
> suppliers. We also source a large proportion of merchandise directly from
> manufacturers, which can result in better pricing for our customers.

74.     The Offering Materials also discussed how the Company purportedly passed on

savings to customers:

> Our structural advantages from complete end-to-end integration, investments in
> technology, and scale economies generate higher efficiencies that allow us to pass
> savings to customers in the form of lower prices. We also source a large portion of
> merchandise directly from manufacturers, which can contribute to better pricing for
> our customers.
>
> \*        \*        \*

In addition, cost efficiencies that we drive across our operations and economies generated from scale enable us to pass these savings on to our customers in the form of lower prices.

75.     The Offering Materials also discussed the Company's past results:

Net retail sales for the year ended December 31, 2020 increased $5,258.0 million, or 90.9% (93.2% on a constant currency basis), as compared to the year ended December 31, 2019. The increase was primarily due to a 18.2% growth in our Active Customers in 2020, as well as 61.5% growth (63.5% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a continual increase in product selection and additional offerings provided to our customers.

*     *     *

Net retail sales for the year ended December 31, 2019 increased $1,988.0 million, or 52.3% (61.4% on a constant currency basis), as compared to the year ended December 31, 2018. The increase was primarily due to a 34.3% growth in our Active Customers in 2019, as well as 13.4% growth (20.1% on a constant currency basis) in our net retail sales per Active Customer during that same period, driven by a general increase in product selection, in-stock availability, and offerings provided to our customers.

76.     The Offering Materials also touted the Company's owned inventory:

While we are focused on increasing our owned-inventory selection in these categories, we also expect to increase the number of merchants offering items in these categories in our marketplace. . . . Our success in increasing selection, including expansion into new categories, has contributed to the increase in total net revenues in 2020, which was up 93.1% on a constant currency basis over 2019.

77.     The Offering Materials also represented that the Company provides its customers

with personalized product promotions and recommendations:

We have developed technology that enables us to increase our operating efficiency through enhanced product merchandising and supply chain management, and to provide our customers with personalized product promotions and recommendations.

78.     The Offering Materials further represented how the Company's search technology

provided personalized results and simplified the customer's online shopping experience:

Our search technology produces a simplified experience that overcomes the lack of standardization and duplicate listings by leveraging our product knowledge graph

to show more unique products in search results, helping customers find, compare, and make purchasing decisions easily.

\*       \*       \*

The foundation of our search and recommendations is a product knowledge graph that organizes by product, not by seller, which enhances the customer experience. Search and recommendation results are aided by deep learning, data analytics, and image recognition among other inputs to produce greater relevance and personalization. As a result, we believe customers can identify what they want and the best value for that product easier through our tools than those on competitive services that require customers to sort through multiple sellers to compare offers for a given product.

79.     The Offering Materials also stated that the Company focused "on innovations around our end-to-end integrated network of technology and infrastructure, new offerings, and effective merchant solutions" and that "[t]hese investments help us deliver superior selection, convenience, and low prices to customers while helping merchants to improve and grow their businesses."

80.     The Offering Materials also discussed how Coupang's technology helped third-party merchants enhance demand generation and promoted holistic competition:

We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation. Our customer-to-product matching technology ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, provides personalized product exposure to customers based on relevance and predicted customer experience. This technology helps merchants compete holistically on overall customer experience.

\*       \*       \*

Our matching technology ingests millions of new merchant listings daily into a product knowledge graph, and, leveraging machine learning, provides product exposure to customers based on relevance and predicted customer experience, among other variables. This helps high-quality merchants compete holistically on overall customer experience. This results in lowering barriers to entry for merchants, and improving experience for customers, which encourages repeat purchasing that generates higher sales for merchants.

81.     The Offering Materials also stated that the Company used a system that rewards

merchants for providing competitive prices:

> Our strategy is to provide the lowest prices available in the Korean market across a
> wide and diverse assortment of items. We achieve this through our diversified
> procurement strategy, which involves scaled procurement from local and
> international suppliers, direct sourcing from manufacturers, and our creation of a
> system that rewards merchants for providing competitive prices.

82.     The Offering Materials also stated that the Company had "policies and procedures

to protect both merchants and customers on our marketplace."

83.     The Offering Materials further represented that Coupang had a customer-centered

culture:

> Since 2013, we have invested billions of dollars to build our owned-inventory
> selection, proprietary technology, and the largest B2C logistics footprint as
> compared to other product e-commerce players in Korea. . . . Those investments
> have been guided by our operating principles of putting customers at the center of
> everything we do. . . . In our view, our culture of customer centricity is our most
> important asset, and it drives us to relentlessly pursue operational excellence and
> innovation.
>
>                           *       *       *
>
> We are committed to delivering a "wow" experience to all of our customers every
> day. This commitment drives every aspect of our operations and pushes us to
> redefine the standards of e-commerce.

84.     On March 11, 2021, Defendant Kim appeared for an interview on *Bloomberg

Markets* in connection with its IPO. In response to a question noting that the Company "had had

several deaths among delivery and logistics employees who are allegedly overworked, overnight

working," and asking "how . . . the company [would] answer . . . this issue," Defendant Kim

responded as follows:

> You know it's heartbreaking, it's a tragedy whenever there's a passing of one of
> our family members, but here's the important context: we have hundreds of
> thousands of people who work in our operation and the fulfillment and delivery,
> and we've had one work-related death in the past year. But one is too many, and

we have to continue to do better. We are actually leading the industry on this front. . . .

85.     During the same interview, the host asked how Coupang could improve the situation "after reports of more than one—several—deaths of your employees." Defendant Kim responded as follows:

> As I mentioned, we have to continue to change and make the standards better. We are raising the bar and will continue to invest. We have invested hundreds of millions of dollars in automation that makes [sic] the deliveries not only a better experience for our customers but the work easier for our employees and we are, we will continue, to create good jobs, the best working condition jobs in the country.

86.     On March 18, 2021, Coupang filed its S-8 Registration Statement. The S-8 Registration Statement expressly incorporated the Offering Materials and reiterated the statements referenced in ¶¶ 67-85 above.

87.     On March 24, 2021, it was revealed that a Coupang employee in his early 40s died on his second day on the job. On March 25, *The Korea Herald* reported that "[t]he courier's death immediately triggered speculation that he may have become the latest delivery worker to die from apparent overwork." On the same day, other media sources published an official statement from Coupang revealing that the deceased courier was allowed to begin delivering packages even though he displayed "heart-related abnormalities in his initial medical examination."

88.     On this news, Coupang's stock fell 5%, from $46.00 on March 23, 2021, to close at $43.70 on March 25, 2021, representing a decline of 5%.

89.     On April 3, 2021, Coupang posted the following on its official website regarding the safety and welfare of its employees:

> Coupang pays great attention to the health and welfare of all employees, and has a great responsibility to protect the safety and health of its employees. Coupang will continue to lead the courier logistics industry by prioritizing the health and safety of its employees. Coupang will continue to make efforts to create a better working environment by considering the health and safety of workers as the company's core value and first management principle.

90.     On April 4, 2021, a business owner who sold goods on Coupang's marketplace for third-party merchants (called the "Item Market") appeared on the investigative program "Straight" on MBC Radio and revealed that Coupang was using his trade material to advertise and secure sales for other merchants in Coupang's Item Market.

91.     To address the business owner's statement on MBC Radio, the Company represented on April 6, 2021 that "Coupang has not infringed on intellectual property rights such as photos of sellers." It also threatened that it would "take strict action" against MBC Radio "after careful review" of its options.

92.     On April 27, 2021, *United Press International* reported on systemic, unsafe working conditions for Coupang's delivery drivers and employees at Coupang's fulfillment centers. The report also noted that nine Coupang workers had died over the past year due to an inhumane working environment and that the Committee for Coupang Workers' Human Rights and Health was pushing to form a labor union to force a safer work environment in response to poor conditions at the Company. The report quoted the co-chairman of the committee as stating that "[t]he management method of running a business at the expense of people's lives should not be tolerated for any reason" and that "[h]umans are not machines."

93.     On May 3, 2021, several civic groups representing the interests of small business owners in South Korea held a press conference announcing that they had also reported Coupang to the Korean Fair Trade Commission ("KFTC") for including excessively disadvantageous content-use terms in its Seller Terms and Conditions and for copyright infringement claims.

94.     On May 4, 2021, Coupang issued another statement through its newsroom in which it reiterated that "Item Market Sales Terms and Conditions do not violate the Fair Trade Act and

Copyright Act" and boldly asserted that "[t]he representative image of the product refers to the image of the product itself, which is not subject to copyright by the seller."

95.    The statement further reported on Coupang's efforts to "muzzle media coverage" by suing journalists who had written about the Company's worker deaths.

96.    On this news, the Company's share price dropped $1.96 per share, or 4.3 percent, over the next two trading days to close at $43.71 per share on April 28, 2021.

97.    On May 4, 2021, Coupang posted a statement to its online newsroom declaring that the Item Winner system allowed sellers to "fairly" compete with one another:

> Coupang's Item Winner (one product, one page system) is an improved service that allows consumers to make purchasing decisions based on consumer experience, unlike existing open markets that focus on advertising cost competition. . . . Through this, sellers can compete fairly without the burden of advertising costs, and customers can easily find the best products.

98.    In the same post, the Company also stated that "[m]any sellers have continued to grow sales by entering the item market where they can compete fairly without advertising costs."

99.    Also in the post, Coupang asserted that its market practices did not violate the Fair Trade and Copyright Acts:

> Item Market Sales Terms and Conditions do not violate the Fair Trade Act and Copyright Act. . . . The representative image of the product refers to the image of the product itself, which is not subject to copyright by the seller. Coupang clearly guides sellers to upload only product images when registering images, and the detail page screens that sellers individually upload are not shared with other sellers. Therefore, the claim that Coupang infringes on the copyrights of sellers' images is not true at all.

100.    On May 13, 2021, August 16, 2021, and November 12, 2021, the Company filed its 2021 first, second, and third quarter financial results on Form 10-Q, each signed by Defendant Parker. In each of the quarterly reports, the Company reiterated that it had "policies and procedures to protect both merchants and customers on our marketplace."

101.    On May 12, 2021, Coupang hosted an earnings call to discuss its first quarter 2021 financial results. During the call, Defendant Kim stated that "the most important competitive advantage that Coupang has is really our orientation" and that "[w]e have made—we have always worked backwards from the customer."

102.    During the same call, Defendant Anand stated as follows in response to a question regarding the "mix" of owned inventory, or first-party (or "1P") versus third-party (or "3P") sales:

[O]n your second question of 1P versus 3P mix change, we continue to see strong growth in both 1P and 3P and there is no material change and mix at this time. So, we are focused on both the services and continue to drive initiatives in each of them. However, over time, we would become agnostic between our owned inventory and third-party selection.

103.    Defendant Kim also discussed the benefits that the Company provided to its customers:

Our unique investments and growing scale create operational efficiencies, which we can pass on to our customers in the form of lower prices. According to a recent third-party study, Coupang's prices were cheaper on average across all surveyed product categories and we estimate that Rocket will have customers saved over $200 million in shipping fees in the first quarter alone.

.  .  . All the benefits we offer customers are amplified by a Rocket WOW membership, fueled by access to services like dawn and same-day delivery as well as our streaming video offering Coupang Play, Rocket WOW members purchase with significantly higher frequency and across more categories than non-WOW members.

104.    During same the call, Defendant Kim further emphasized that the "most important competitive advantage that Coupang has is really our orientation" and that "wehave always worked backwards from the customer."

105.    Between June 14 and July 2, 2021, Coupang posted on its official website the following statements concerning its relationships with merchants and suppliers:

Coupang is focusing its efforts on expanding online sales channels and supporting sales of small and medium-sized businesses in the region. Coupang will continue

to support small and medium-sized businesses in order to revitalize local coexistence and the stagnant local economy.

106.    On June 17, 2021, a fire broke out in the basement of the Company's Deokpyeong Logistics Fulfillment Center ("Deokpyeong Facility") located south of Seoul. It took emergency response workers six days to finally extinguish the fire on June 22, 2021. The fire sparked outrage among the public in South Korea as protestors claimed that the fire resulted from Coupang's imposition of inhumane working conditions. The Deokpyeong Facility and the massive inventory it housed were destroyed.

107.    On June 20, 2021, Sang-gyu Lee, head of the Fire and Disaster Headquarters of the province where the Deokpyeong Facility is located, revealed that based on its preliminary investigations the sprinklers were "delayed by about 8 minutes."

108.    On June 21, 2021, a worker from the Deokpyeong Facility offered their account of the fire in a petition posted to the official website of the President of South Korea entitled "The fire at Coupang's Deokpyeong Logistics Center was not the first." The petition contained a detailed understanding of the internal layout of the facility and information regarding the fire that was corroborated by subsequent evidence. The worker said the alarm first went off between 5:10 and 5:15 a.m. but that the worker did not stop because workers were told "don't worry about it, just keep doing what you're doing" whenever that happened in the past. The worker pleaded with a security guard to alert authorities that there was smoke in the Deokpyeong Facility. The guard reportedly laughed at the worker.

109.    According to a statement issued by a transportation union under the Korean Confederation of Trade Unions, "[a]ctivation of sprinklers was delayed because they were shut off due to frequent malfunction." Thousands of Coupang customers posted online that they had deleted their Coupang accounts, noting the hashtag "Leave Coupang." Many of the posts chastised

the Company's poor working conditions and accused Coupang of overworking its employees in its warehouses. Opposition lawmaker Kim Yong-pan, a member of the Public Administration and Security Committee in the National Assembly, South Korea's legislature, called the fire "a sad event that shows negligence of safety is still prevalent in our society." Aside from such criticism, this fire would ultimately cost Coupang millions of dollars in lost inventory, equipment, and other charges. The fire damaged Coupang's business and badly harmed its reputation among current and potential customers. However, Coupang did not disclose the full costs of either the fire or the unsafe working conditions to which the Company was subjecting employees.

110.    On June 28, 2021, the KFTC opened an investigation into whether Coupang manipulated its search algorithm to favor its PB products and conducted an on-site field inspection at Coupang's headquarters in Seoul.

111.    On July 5, 2021, the *Financial Times* published an article entitled "Coupang faces probe over alleged manipulation of search algorithms," reporting that Coupang was being investigated by the KFTC over "allegations it manipulated search algorithms to [prioritize] its own products over those of suppliers." Several other news outlets reported the same.

112.    On this news, Coupang's stock price dropped $0.51 per share, or 1.3 percent, to close at $39.95 per share on July 6, 2021.

113.    On July 21, 2021, the KFTC confirmed that the Company's Seller Terms and Conditions that the Coupang reportedly forced on small businesses imposed "unfair" content-use provisions that were "invalid" under South Korea's Copyright Act and Act on the Regulation of Terms and Conditions. The KFTC required Coupang to modify the provisions that (1) allow Coupang to freely use the seller's content without restriction and (2) exempt Coupang from legal responsibility for its use of such content. Indeed, rather than granting Coupang unrestricted access

to such content, the KFTC required Coupang to amend its Seller Terms and Conditions to provide that "copyright and ownership of product content provided by sellers are not transferred to [Coupang]" and that, going forward, "the image provided by the seller who has become an Item Winner will be used as a representative image of the same or similar products" absent extraordinary circumstances.

114.     On August 11, 2021, the Company issued a press release announcing its second quarter 2021 earnings release. In it, Coupang reported a loss of $518.6 million for its second quarter. The majority of this loss resulted from the fact that the Company lost almost $300 million in inventory and equipment during the fire at the Deokpyeong Facility.

115.     During the related earnings call, Defendant Kim asserted as follows:

> We exist to deliver new moments of WOW for customers. Everything we do at Coupang revolves around wowing our customers. Our confidence that we'll continue to make investments, to keep chasing the demand, to make sure that our customer experience is not compromised, that we protect long-term customer trust. Because – and we'll continue to do that aggressively, because we know that our investments will pay off over time.

116.     During the same call, Defendant Kim also stated that "[o]ur investments that continuously strengthen the virtuous cycle across our business are driving significant growth for merchants and vendors."

117.     During this call, Defendant Kim asserted that the Company was "continuing to make Coupang the best workplace" by providing benefits to its drivers and "making meaningful investments to help employees improve their health and increase health awareness" and that "since the beginning of 2020, we've added over 600 safety employees and invested over $200 million in worker safety initiatives."

118.     During the same earnings call, Coupang emphasized its focus on attracting third-party sellers to the Company and how building those positive relationships allowed Coupang to

better serve its customers. Specifically, Defendant Kim stated that these relationships "increase[] selection and convenience for customers, which in turn attracts even more customers and higher frequency, broadening the top of the funnel for both offerings." Kim further stated that Coupang's third-party merchants' growth "accelerat[ed] on the back of strong [first-party] growth" and that these offerings were "growing fast and fueling one another," not competing.

119.    According to an August 12, 2021 *Financial Times* article discussing these developments, the fire was a major contributor to the Company's losses. An article in Korea JoongAng Daily wrote that the fire "more than doubled [Coupang's] loss."

120.    On this news, Coupang's stock price dropped $3.07 per share, or 8.3 percent, to close at $34.13 per share on August 12, 2021.

121.    Also on August 11, 2021, the KFTC held a full panel hearing to weigh the evidence collected during an investigation into the Company's treatment of its suppliers in violation of South Korea's antitrust laws that had allegedly been ongoing since 2019.

122.    On August 18, 2021, the KFTC issued a corrective order and fined Coupang around $2.8 million for forcing hundreds of suppliers to comply with unlawful sales and marketing demands that violated South Korea's Monopoly Regulation and Fair Trade Act and the Act on Fair Transactions in Large Retail Businesses.

123.    The KFTC found that, between 2017 and September 2020, Coupang coerced its suppliers to (1) raise the price of products on competing e-commerce sites; (2) purchase advertisements to make up for lost margins; (3) bear the full cost of sale initiatives run by Coupang; and (4) pay sales incentives not specified in the annual sales contract.

124.    The KFTC noted these findings as "significant" because it was the first time that an online distributor held a superior trade position relative to large manufacturers with popular

products. At the related press briefing, a senior KFTC official, Cho Hong-sun, emphasized that "[t]he case is noteworthy as it illustrates that an online retailer is now in a predominant position over large companies."

125.    In calculating the appropriate penalty, the KFTC determined that each of the improper practices described above qualified as a "very serious violation" under applicable law given the fact that they were used with multiple counterparties over an extended period of time. The KFTC reduced the total penalty by 60 percent because Coupang's liabilities exceeded its assets in 2020.

126.    The KFTC directed Coupang to notify all its suppliers that it was ordered by the KFTC to correct its improper practices to avoid further violations of South Korean antitrust laws.

127.    On August 18, 2021, *The Korea Times* published an article stating that Coupang had been sanctioned by the KFTC for forcing "hundreds of [third-party] sellers from early 2017 to September 2020 to comply with its unlawful sales and marketing policies to maintain its competitive edge over other online retailers amid the fierce battle for market dominance." The article further stated the Company pressured sellers to raise prices in goods sold at rival marketplaces "to ensure that [Coupang] could offer those products at the cheapest prices" and coerced "suppliers to purchase ads."

128.    On August 19, 2021, Coupang addressed the KFTC sanctions in a post on its official website:

> I will tell you about the FTC sanctions. The essence of this case is that large conglomerate manufacturers discriminated against supply prices in order to check new distribution channels such as Coupang. In fact, LG Household & Health Care, the No. 1 household goods company in Korea, has used its exclusive supplier position to supply major products to Coupang for a long time at prices higher than those of other distributors. . . . Coupang has attempted to innovate so that consumers can purchase products faster and cheaper in the distribution market, which has been dominated by chaebols and conglomerates. At the same time, we have continued to

innovate distribution by lowering entry barriers to [small and medium-sized businesses (or "SMEs")] and pursuing shared growth.

129.    On this news, Coupang stock dropped $1.08 per share, or 3.4 percent, over the following two trading days to close at $31.29 per share on August 20, 2021.

130.    On September 10, 2021, the KFTC announced that Coupang had been engaging in and would be regulated for manipulating its search algorithm and improperly prioritizing its own products over those of third-party sellers.

131.    On this news, Coupang stock dropped $0.27 per share, or 0.9 percent, to close at $29.98 per share on September 10, 2021.

132.    On September 16, 2021, Coupang posted on its website the following statement regarding the Company's relationships with its merchants and suppliers:

> The "Item Market," which allows fair competition without the burden of advertising costs, was also cited as a reason for being friendly to small business owners. In order to solve the unfair sales structure centered on advertising cost competition, Coupang is operating an "Item Market" system that comprehensively evaluates price, delivery, and customer response so that products that consumers will prefer the most are exposed first.

133.    On November 12, 2021, the Company issued a press release announcing its third quarter 2021 financial results. It disclosed higher than expected costs from the June 2021 fire, especially costs associated with labor and operations, and the fact that the fire was affecting Coupang's operating and fulfillment capacity.

134.    During the associated related earnings call, Defendant Kim stated as follows:

> Our strategy to build compounding customer loyalty and long-term stockholder value is reflected in our core operating tenants. . . . One, we exist to deliver new moments of WOW for customers and create a world where they asked, "How did we ever live without Coupang?" . . . Three, we . . . employ technology, process innovation, and economies of scale to create an amazing customer experience and drive operating leverage and significant cash flows over time.

135.    During the same earnings call, Defendant Anand stated that "[w]e were less aggressive on customer acquisition this quarter to improve the experience for existing customers," that "[p]rioritizing what's best for customers drives loyalty and engagement," and that "we believe that is the best long-term approach."

136.    During the same call, Defendant Kim disclosed that the Company was having trouble hiring employees and that this difficulty was attributable in part to the June 2021 fire, which "[led] to [] inefficiency in [Coupang's] network."

137.    During the related earnings call, Defendants assured investors that Rocket WOW memberships induced consumer loyalty by providing an enhanced consumer experience. Specifically, in discussing Rocket WOW, Defendant Kim claimed that "the higher loyalty and engagement from these differentiated experiences will further broaden our customer funnel."

138.    On this news, Coupang's stock price dropped $2.61 per share, or 8.9 percent, to close at $26.58 per share on November 12, 2021.

139.    On February 27, 2022, Coupang posted another statement to its online newsroom stating that the Company's "product reviews are operated in a fair and transparent manner" and that "when an employee writes a review, it is clearly stated." The statement continued by saying that "[w]hen partners, including [its Coupang Private Label Business or "CPLB" subsidiary], launch new products in Coupang, Coupang employees and members are given the opportunity to try the products first, and reviews are provided to help customers shop."

140.    On March 3, 2022, Coupang filed with the SEC its annual report on Form 10-K for its fiscal year 2021 (the "10K21"). Defendants Kim, Anand, Parker, Mehta, Sun, Warsh, and You signed the 10K21.

141.    The 10K21 stated that "[w]e also continue to refine our business intelligence systems to provide more personalized search results and recommendations to help existing customers find and buy more of what they need on Coupang."

142.    Similarly, the 10K21 further stated that the Company was "committed to delivering a 'wow' experience to all of our customers every day" and that "[t]his commitment drives every aspect of our operations and pushes us to redefine the standards of e-commerce."

143.    The 10K21 provided as follows regarding how the Company's technology helped its merchants:

> We offer merchants of all sizes effective solutions to improve their customer experience and enhance demand generation. Our customer-to-product matching technology ingests millions of new merchant listings daily into our product knowledge graph, and, leveraging machine learning, provides personalized product exposure to customers based on relevance and predicted customer experience. This technology helps merchants compete holistically on overall customer experience.

144.    The 10K21 also restated that the Company had "policies and procedures to protect both merchants and customers on our marketplace."

145.    On March 6, 2022, the KFTC issued a press release stating that Coupang had violated South Korea's E-Commerce Act by failing to maintain written dispute-resolution rules accessible to consumers on its online store for disagreements between sellers and buyers. The KFTC's release noted that Coupang's practice "restricted" customers "from exercising their right to transparently and quickly resolve complaints or disputes experienced in the process of using the platform."

146.    On March 21, 2022, it was revealed that KFTC's Market Surveillance Bureau initiated an investigation into the claims raised by the People's Solidarity for Participatory Democracy and The Voice of Consumers on March 15, 2022, alleging that Coupang was mobilizing its employees to issue positive reviews for the Company's PB products, including

reviews that failed to identify the user as an employee of the Company. Normally, the KFTC assigns investigations to regional offices but would have offices in its headquarters, such as the Market Surveillance Bureau, lead an investigation when the social impact of the case is significant. The KFTC sent investigators to Coupang's headquarters in Seoul on May 17, 2022, to collect evidence relating to review manipulation, including documents.

147.    On March 22, 2022, *Korea JoongAng Daily* published an article reporting that the KFTC had opened yet another investigation into Coupang. The KFTC's investigation related to claims that the Company was manipulating product reviews for its PB products, sold through its CPLB subsidiary, to make them appear more positive. Specifically, the article stated as follows in relevant part:

> On March 15, civic groups such as the People's Solidarity for Participatory Democracy and The Voice of Consumers accused Coupang of making their employees write positive reviews for CPLB products.

> CPLB is a subsidiary wholly owned by Coupang. It sells everyday items such as clothes, pet supplies and food on the e-commerce website.

> The civic groups claim Coupang ordered its employees to write positive reviews for some 42,000 CPLB products since July last year, when the subsidiary started business. They said the reviews didn't explicitly state they were written by Coupang or CPLB workers, even though a disclaimer is required for reviews by employees of affiliates and people who were given the products for free.

> The FTC said it will investigate whether the civic groups' claims are true and if Coupang violated the Monopoly Regulation and Fair Trade Act and the Act on Fair Labeling and Advertising.

> According to the civic groups, a suspected Coupang or CPLB employee bought huge amount of products – 600 latex gloves, 350 masks, 150 liters (40 gallons) of cat litter sand throughout a month – and gave five stars to CPLB products but left one star ratings on non-Coupang products.

> The civic groups also claimed that the positive reviews and higher star ratings made CPLB products show up at the top of a search, giving them more exposure and leading to more purchases.

148.     On May 11, 2022, the Company held an earnings call to discuss its first quarter

2022 financial results. During the call, Defendant Kim stated that the Company was "on a journey

to make WOW an indispensable part of our customers' lives."

149.     Then, on July 13, 2022, *The Korea Times* released an article entitled "Coupang,

Naver hit by antitrust allegations" reporting that Coupang was now also under investigation by the

KFTC for falsely advertising the membership benefits of its Rocket WOW membership services:

> Korea's two IT giants, Coupang and Naver, are under investigation by the Fair
> Trade Commission (FTC) over allegations that they falsely advertised membership
> benefits and deceived customers, according to industry watchers, Wednesday.

> A dozen investigators with the antitrust agency were dispatched to the headquarters
> of Coupang in Songpa District, southeastern Seoul, and Naver in Bundang District
> of Seongnam, Gyeonggi Province, from late Monday through Tuesday, to conduct
> on-site investigations.

> Coupang allegedly sold goods to non-member customers at a lower price than those
> who paid monthly fees of 4,990 won ($3.82) for Wow membership, a sales practice
> Wow members characterize as reverse discrimination.

> The allegation was first raised in May and amplified since then due to a large
> number of Coupang users filing complaints with a government website run by the
> Anti-Corruption & Civil Rights Commission.

> Many claimed that the prices shown to members and non-members alike indicate
> Wow members would be able to buy goods at cheaper prices compared to non-
> members, but the price is the same when Wow members make a purchase.

150.     On this news, Coupang's stock price dropped $0.74 per share, or 5.0 percent, over

the following two trading days to close at $14.25 per share on July 14, 2022.

151.     As a result of Defendants' wrongful acts and omissions and the precipitous decline

in the market value of the Company's securities, the Company has suffered significant losses and

damages.

152.     The above statements identified in ¶¶ 89, 91, 94, 97-105, 114-18, 128, 132-37, 139,

141-44, and 148 were materially false and misleading and failed to disclose material adverse facts

about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (a) Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including (i) pressuring suppliers to raise prices of products on competing e-commerce platforms to ensure Coupang's prices would be more competitive, (ii) coercing suppliers into purchasing advertisements that would benefit Coupang financially, (iii) forcing suppliers to shoulder all expenses from sales promotions, and (iv) requesting wholesale rebates from suppliers without specifying any terms relating to rebate programs, all of which served to artificially maintain Coupang's lower prices and artificially inflate Coupang's historical revenues and market share; (b) Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform to prioritize its PB products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers; (c) unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members; (d) Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions; (e) all of the above illicit practices exposed Coupang to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm Coupang's critical relationships with consumers, merchants, suppliers, and the workforce; and (f) Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper, unethical, and/or illegal practices, and, thus, unsustainable. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

## AN INVESTOR FILES A SECURITIES CLASS ACTION

153.    On August 26, 2022, a purported purchaser of Company stock filed a securities class action complaint, captioned *Choi v. Coupang, Inc., et al.*, Case No. 1:22-cv-07309, in the

United States District Court for the Southern District of New York against Coupang and defendants Anand, Christensen, Jett, Kim, Mehta, Parker, Sun, Warsh, and You (the "Securities Class Action"). The Securities Class Action alleges that throughout the class period of March 8, 2021 to March 14, 2022, defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Securities Class Action alleges that the IPO's registration statement failed to disclose that (a) Coupang was engaged in improper anti-competitive practices with its suppliers and other third parties in violation of applicable regulations, including: (i) pressuring suppliers to raise prices of products on competing e-commerce platforms to ensure Coupang's prices would be more competitive; (ii) coercing suppliers into purchasing advertisements that would benefit Coupang financially; (iii) forcing suppliers to shoulder all expenses from sales promotions; and (iv) requesting wholesale rebates from suppliers without specifying any terms relating to rebate programs, all of which served to artificially maintain Coupang's lower prices and artificially inflate Coupang's historical revenues and market share; (b) Coupang had improperly adjusted search algorithms and manipulated product reviews on its marketplace platform to prioritize its own private-label branded products over those of other sellers and merchants, to the detriment of consumers, merchants, and suppliers; (c) unbeknownst to its Rocket WOW members, Coupang was selling products to non-member customers at lower prices than those offered to its Rocket WOW members; (d) Coupang subjected its workforce to extreme, unsafe, and unhealthy working conditions; (e) all of the above illicit practices exposed Coupang to a heightened, but undisclosed, risk of reputational and regulatory scrutiny that would harm Coupang's critical relationships with consumers, merchants, suppliers, and the workforce; and (f) Coupang's lower prices, historical revenues, competitive advantages, and growing market share were the result of systemic, improper,

unethical, and/or illegal practices, and, thus, unsustainable.'" Additional investors filed suit, and the court has now consolidated the cases and appointed a lead plaintiff and lead counsel. The lead plaintiff filed an amended complaint on May 5, 2023, and the defendants moved to dismiss that pleading on July 29, 2023. On October 3, 2023, the lead plaintiff filed its opposition to that motion, which remains pending.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT
## DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO COUPANG

154.     As a result of the Individual Defendants' misconduct, Coupang disseminated improper public statements concerning Coupang's operations, prospects, and internal controls. This misconduct has devastated Coupang's credibility.

155.     As a direct and proximate result of the Individual Defendants' actions, Coupang has expended and will continue to expend significant sums of money defending and paying any judgment or settlement in the Securities Class Action.

156.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Coupang's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

157.     The actions of the Individual Defendants have also irreparably damaged Coupang's corporate image and goodwill. For the foreseeable future, Coupang will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Coupang's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

158.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued or joined in the pursuit of a common course of conduct and have acted in concert with and

conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

159. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

160. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the actions described herein occurred under the authority and approval of the Board.

161. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

162.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Coupang and was at all times acting within the course and scope of such agency.

## PLAINTIFFS HAVE BEEN STOCKHOLDERS SINCE THE ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS

163.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

164.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

165.    Plaintiffs are owners of Coupang common stock and have been owners of Coupang common stock since the wrongdoing alleged herein.

166.    Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

## DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY

167.    At the time that Plaintiffs commenced this action, the Board consisted of seven directors, including Director Defendants Kim, Mehta, Sun, and Warsh and Relevant Non-Parties Child, Franceschi, and Toubassy. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

168.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Coupang's business, operations, prospects, internal controls, and financial statements.

169.     Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

170.     Here, the Director Defendants failed to, among other things, implement safety measures in its fulfillment centers and protect its third-party merchants and suppliers from anti-competitive practices. This fact is shown by, among other things, the fact that there was no board-level committee charged with evaluating and managing risks to the Company and that there was no system for ensuring that mission-critical information was provided directly to the Board rather than being siphoned through the Company's management.

171.     The Director Defendants also ignored red flags of the Officer Defendants' false and misleading statements in the form of publicly available analyses. Such analyses asserted that the Company was engaging in anti-competitive practices and misappropriating protected trade materials for its own economic gain.

172.     The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute

breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

173.    If Director Defendants were to bring a suit on behalf of Coupang to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiffs' making a demand would be futile.

### THE AUDIT COMMITTEE DEFENDANTS FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY

174.    The Audit Committee Defendants (Defendants Mehta, Sun, and You), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

### THE GOVERNANCE COMMITTEE DEFENDANTS FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY

175.    The Governance Committee Defendants (Defendants Jett, Mehta, Sun, Warsh, and You) are sophisticated members of the Board with substantial training and experience on corporate governance matters and the importance of accurate disclosures to the investing public. Accordingly, the Governance Committee Defendants had to have known about the problems with the Company's (i) exploiting the physical health of its frontline workers for its own economic gain; (ii) maintaining large fulfillment centers that failed to follow basic fire safety measures; (iii)

forcing suppliers to raise the price of their goods on competing platforms to maintain its profit margins on those goods; (iv) requiring or forcing suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods; (v) misappropriating protected trade materials from merchants for Coupang's economic gain; (vi) manipulating search results to favor Coupang's PB products to the detriment of its suppliers and merchants (vii) misappropriating protected trade materials from merchants for its economic gain; (viii) manipulating search results to favor its own PB products to the detriment of its merchants; (ix) imposing terms and conditions on merchants that allowed the Company to misappropriate protected trade materials from merchants for its own economic gain; and (x) failing to make required dispute resolution procedures accessible to consumers. Therefore, the Governance Committee Defendants face a substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

### THE SECURITIES CLASS ACTION DEFENDANTS ON THE BOARD FACE AN EVEN GREATER LIKELIHOOD OF PERSONAL LIABILITY THAN OTHER DIRECTOR DEFENDANTS

176.    The Securities Class Action Defendants (Christensen Jett, Kim, Mehta, Sun, Warsh, and You) are incapable of considering a demand to commence and vigorously prosecute this action because they each face an additional substantial likelihood of liability.

177.    The Securities Class Action Defendants are named defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Exchange Act as well as SEC Rule 10b-5 promulgated under the Exchange Act. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and directors of Coupang. Hence, the Securities

Class Action Defendants are incapable of considering a demand to commence and vigorously prosecute this action because they each face an even greater likelihood of personal liability than the rest of the Defendants.

### DEFENDANT KIM LACKS INDEPENDENCE

178.     Defendant Kim is not an independent director. Kim is not independent because of his principal occupation is CEO. As explained by a Form 10-Q filed with the SEC on May 13, 2021, Defendant Kim and the Company entered into an employment offer letter dated March 4, 2021, wherein Kim is eligible for, among other things, an annual base salary of $850,000 as CEO. This amount is material to Defendant Kim, and therefore, he would not be able to impartially consider a demand against Defendants (Jett, Mehta, and Warsh), who are members of the Compensation Committee, and thus approve his executive compensation.

### FIRST CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duties

179.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

180.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Coupang's business and affairs.

181.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

182.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Coupang.

183.   In breach of their fiduciary duties owed to Coupang, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that the Company (i) continued exploiting the physical health of its frontline workers for its own economic gain; (ii) maintained fulfillment centers that failed to follow basic fire safety measures; (iii) forced suppliers to raise the price of their goods on competing platforms to maintain its profit margins on those goods; (iv) forced suppliers to purchase services from Coupang against their will to mitigate its margin losses on their goods; (v) misappropriated protected trade materials from merchants for its own economic gain; (vi) manipulated search results to favor its PB products to the detriment of its suppliers and merchants (vii) misappropriated protected trade materials from merchants for its own economic gain; (viii) manipulated search results to favor its own private brand products to the detriment of its merchants; (ix) imposed terms and conditions on merchants that allowed it to misappropriate protected trade materials from merchants for its own economic gain; and (x) failed to make required dispute resolution procedures accessible to consumers.

184.   Accordingly, Coupang's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

185.   The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

186.   The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

187.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

188.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

189.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Coupang has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SECOND CAUSE OF ACTION
### Against the Securities Class Action Defendants
### for Contribution Under Sections 10(b), 20(a) and 21D of the Exchange Act

191.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

192.     Coupang along with the Securities Class Action Defendants (Anand, Christensen, Jett, Kim, Mehta, Parker, Sun, Warsh, and You) are named as defendants in at least one Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 as well as violations of Section 11(f) of the Securities Act. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or director of Coupang.

193.     Because of their positions of control and authority as officers and/or directors of Coupang, the Securities Class Action Defendants was/were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Coupang, including the wrongful acts complained of herein and in the Securities Class Action.

194.     Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act, as well as Section 11(f) of the Securities Act, which creates a private right of action for contribution arising out of violations of the Securities Act.

195.     As such, Coupang is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

**THIRD CAUSE OF ACTION**
**Against the Securities Class Action Defendants for**
**Contribution and Indemnification Under Section 11(f) of the Securities Act**

196.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

197.    As a named defendant in the Securities Class Action, Coupang is a joint tortfeasor in claims brought under Section 11 of the Securities Act on behalf of its stockholders. However, Section 11(f) of the Securities Act provides Coupang with a cause of action against other alleged tortfeasors in the Securities Class Action.

198.    The Securities Class Action alleges that the Registration Statement contained untrue statements of material facts and omitted to state other facts necessary to make the statements therein made not misleading in accordance with the rules and regulations governing proper preparation of a registration statement. Coupang is the registrant for the IPO, and the Individual Defendants were responsible for the contents and dissemination of the Registration Statement.

199.    The Securities Class Action also alleges that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

200.    As issuer of the shares, Coupang is strictly liable to the plaintiffs in the Securities Class Action for the misstatements and omissions alleged in the Securities Class Action.

201.    Because of their positions of control and authority as officers and/or directors of Coupang, the Securities Class Action Defendants were able and did, directly and/or indirectly, exercise control over the business and corporate affairs of Coupang, including the wrongful acts complained of herein in the Securities Class Action.

202.    Therefore, to the extent the Company is found liable for violations of Section 11 of the Securities Act, the Individual Defendants are liable to the Company pursuant to Section 11(f) for all appropriate contribution and/or indemnification.

## FOURTH CAUSE OF ACTION
### Against the Individual Defendants for Unjust Enrichment

203.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

204.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Coupang.

205.    The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Coupang that was tied to the performance or artificially inflated valuation of Coupang, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

206.    Plaintiffs, as stockholders and representatives of Coupang, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

207.    Plaintiffs on behalf of Coupang have no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Against the Individual Defendants for Waste of Corporate Assets

208.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

209.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

210.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

211.     Plaintiffs on behalf of Coupang have no adequate remedy at law.

### SIXTH CAUSE OF ACTION
### <u>Against all the Individual Defendants for Aiding and Abetting</u>

212.     Plaintiffs incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

213.     Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Coupang and has participated in a conspiracy in breach of fiduciary duties.

214.     In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

215.     The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects;

prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

216.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

217.   Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

218.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Declaring that Plaintiffs may maintain this derivative action on behalf of Coupang and that Plaintiffs are proper and adequate representatives of the Company;

B.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.   Awarding prejudgment interest to the Company;

D.   Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.   Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  December 20, 2023                    Respectfully submitted,

                                                                BRAGAR EAGEL & SQUIRE, P.C.


                                                                */s/ Lawrence P. Eagel*
                                                                Lawrence P. Eagel
                                                                Gabriela A. Cardé
                                                                810 Seventh Avenue, Suite 620
                                                                New York, NY  10022
                                                                Telephone: (212) 308-5858
                                                                Facsimile:  (212) 486-0462
                                                                Emails:  eagel@bespc.com
                                                                              carde@bespc.com

**VERIFICATION**

I, Mark Hattori, hereby verify that I have authorized the filing of the attached Verified

Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the

Complaint, and as to those allegations of which I have personal knowledge, I believe those

allegations to be true. As to those allegations of which I do not have personal knowledge, I rely

on my counsel and their investigation and, for that reason, believe them to be true. I further

verify that I am a current holder, and have been a holder, of Coupang, Inc common stock at all

relevant times.

Executed this 18/ day of December, 2023.

*Mark Hattori*
Mark Hattori (Dec 18, 2023 16:06 MST)
Mark Hattori

**VERIFICATION**

I, Susan Newman, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of Coupang, Inc common stock at all relevant times.

Executed this 18 day of Dec , 2023.

susan newman (Dec 18, 2023 17:02 EST)

Susan Newman